[No. 36407-7-II.   Division Two.   June 10, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. TREMAYNE JAMONE REED, *Appellant*.

*David L. Donnan* and *Lila J. Silverstein* (of *Washington Appellate Project*), for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

¶1 VAN DEREN, C.J. — Tremayne Reed appeals his attempted first degree murder conviction for the 2006 shooting of a police officer. Reed argues that (1) the "to convict" jury instructions were improper, (2) the State failed to prove beyond a reasonable doubt that Reed acted with premeditated intent, (3) the trial court erred in failing to suppress the photographic identification of Reed, and (4) the trial court improperly imposed an exceptional sentence. The State concedes that the matter should be remanded for further sentencing proceedings. We agree with the State's concession and affirm Reed's conviction but remand for resentencing.

## FACTS

¶2 On March 25, 2006, at approximately 12:23 AM, Reed fired two shots at Puyallup Police Officer Gary Shilley in the parking lot of the South Hill Mall. One shot hit Shilley in the face. Reed was arrested for, charged with, and convicted of first degree attempted murder (count I) and first degree unlawful possession of a firearm (count II).

### I. SHOOTING

¶3 At trial, Shilley testified that he was on his way to another call when he observed a red Jeep parked in the South Hill Mall parking lot. He thought "the vehicle was possibly broken down and somebody needed help." Report of Proceedings (RP) (Apr. 26, 2007) at 60-61. Shilley did not

activate his emergency lights when he entered the parking lot because he "had no reason to." RP (Apr. 26, 2007) at 70. He "approached . . . head on and then turned to the left and circled around [the vehicle] before [he] came up behind it."[1] RP (Apr. 30, 2007) at 32. According to protocol, he "let dispatch know over the radio" that he had stopped. "[He] gave dispatch the license plate number of the vehicle and . . . a description of the vehicle." RP (Apr. 30, 2007) at 15-16. He also gave a description of the person standing outside the Jeep as a "young black male." RP (Apr. 30, 2007) at 20.

¶4  Before Shilley exited his vehicle to approach the Jeep, he "waited a second or two" and then "fixed [his] spotlight and looked down the driver's side of the vehicle." When he exited the patrol car, Shilley "closed the door, had [his] flashlight in [his] left hand . . . and walked up to . . . the driver's side of the vehicle." RP (Apr. 30, 2007) at 20-21. As he was walking toward the Jeep, he did not "say anything or attempt to make any verbal contact with the individual." RP (Apr. 30, 2007) at 24. Shilley testified:

> [A]s I got to the driver's door, my best recollection, driver's door, driver's mirror, about there, all I remember at that point is a black silhouette jumping up from in front of the vehicle and a flash in my face. And it felt like somebody hit my face with a hammer, and my optic nerve was shut down at that point and I was blind.[2]

RP (Apr. 30, 2007) at 21. Shilley saw only a silhouette; he did not see the shooter's face. He testified that he did not deploy his gun or his stun gun at any point during the stop.

---

[1] Shilley testified that he did not "stop alongside the Jeep at any time" and that he had no "recollection as to the person . . . coming over on foot to [Shilley's] patrol car." RP (Apr. 30, 2007) at 33. But the South Hill Mall surveillance videotape indicates that Shilley parked his patrol car almost parallel with the Jeep on the passenger side and the driver of the Jeep walked to the driver's side window of Shilley's patrol car at one point during the encounter.

[2] It appears from the surveillance video that actually Shilley was on the passenger side of the Jeep, rather than the driver's side.

## II. INVESTIGATION

¶5 The Jeep drove away and Shilley called for help over the radio. Puyallup Police Officer David Temple heard Shilley's radio dispatch and responded to the scene. When Temple arrived, he saw Shilley lying down on his elbows, "trying to hold himself up," with his head facing downward and a pool of blood on the ground. RP (Apr. 26, 2007) at 22. Temple asked Shilley what happened and Shilley responded, " 'I've been shot. I've been shot.' " RP (Apr. 26, 2007) at 24. Shilley could not identify the shooter but said he was a black male. He told Temple that the shooter was driving a red Jeep Cherokee. Shilley was wearing a bullet-proof vest. Shilley's gun and stun gun were still in their holsters and Shilley's emergency lights on his patrol car were not activated. Temple found a license plate number in Shilley's mobile data terminal. Temple gave the number to dispatch for broadcast and then he broadcast the make and model of the vehicle and "the racial description of the suspect." RP (Apr. 26, 2007) at 30.

¶6 On the morning of March 25 at approximately 12:05 AM, Washington State Patrol Sergeant Thomas Olson was driving an unmarked police car to a Denny's restaurant located near the South Hill Mall to meet other officers. He testified that, when he came to a stop at a stoplight,

> I observed a red SUV [sport utility vehicle] coming up over 512 toward the intersection going southbound on 9th Street. It was slowing so obviously its light had started to change. Mine turned green. As I slowly started to come through the intersection, I was looking to my left toward the vehicle. We were the only two vehicles in the intersection.
>
> . . . I looked at the driver and, immediately upon seeing him, we had locked eye contact. I found that kind of unusual.
>
> . . . [A]s I continued in front of the vehicle, I continued to look right at the driver, and we stayed in eye contact . . . all the way through my turn until I was out of sight we had complete eye contact all the way through the side window and as I passed him.

The distance of separation between my vehicle and his was he was in lane two, which would be the inside lane of 9th Street. Then there's like an open turn lane there, and then I turned into the nearest lane, being the inside lane, to go northbound. So we had one lane separation between the two of us.

RP (May 14, 2007) at 12-13.

¶7 When Olson arrived at Denny's, he heard on the police radio that an officer was down. He and other officers began searching the area. While searching, he heard on the radio that the suspect was a black male driving a red SUV. That jogged Olson's memory about his earlier contact with the vehicle and driver and he realized that he may have just seen the suspect three to four minutes earlier. Olson and the other officers went to the scene of the shooting.

¶8 At the shooting scene, Olson looked at a booking photograph of the Jeep's registered owner. He knew immediately that the registered owner was not the person he had observed at the intersection. Olson testified that the registered owner was "either very light skin black or black mixed with Asian, but he was very light skinned."[3] RP (May 14, 2007) at 23.

¶9 Olson also looked at three or four photographs of Reed, who was the last person associated with the Jeep.[4] Olson positively identified Reed as the person he had seen in the red SUV that morning. "There was just the shape of the face, and more so than anything else was his eyes. What I saw in his eyes as he stared at me going around the intersection to what I saw looking at the booking photo, it was definitely the same person." RP (May 14, 2007) at 24.

---

[3] There is conflicting testimony regarding whether the registered owner of the red Jeep was male or female. It appears that the person in the booking photograph may have been someone associated with the registered owner.

[4] Reed had been stopped and cited a few days prior to the shooting by Washington State Patrol Officer Kelly Kalmbach. Kalmbach testified that she had stopped Reed in the red Jeep on the night of March 21, 2006, because he did not have his lights on. She cited Reed for driving while his license was suspended and did not allow Reed to drive the car from the scene. When Kalmbach left the scene of the stop, Reed was "attempting to make a phone call to have someone come and pick up the vehicle." RP (May 1, 2007) at 126.

¶10 When dispatch relayed Reed's identification as the last known person associated with the Jeep, Pierce County Deputy Sheriffs Trent Stephens and Gary Sanders went to Reed's apartment complex. A Lakewood Police Department patrol unit also responded to the apartment complex. Stephens and Sanders approached the front door of the apartment complex while the Lakewood officers covered the back.

¶11 Stephens and Sanders knocked and announced that they were police officers. A woman, later identified as Courtney Cihla, answered the door and they asked her about the red Jeep. Reed appeared in the doorway and, upon request, Reed and Cihla admitted Stephens and Sanders into the apartment. Reed told the officers that he had purchased the Jeep from a woman named Catalina Atalig a few weeks earlier. He told them that he had been stopped by police a few nights earlier and that a friend was supposed to pick up his vehicle but never did. He said that he had been home "during the course of the" evening watching movies with Cihla. RP (May 1, 2007) at 31. Stephens and Sanders asked Reed if he would accompany them to the South Hill Precinct and he agreed.

¶12 Pierce County Detective Sergeant Todd Carr interviewed Reed at the police station. Puyallup Police Officer Peter Bellmer found the Jeep, running and unoccupied, parked on a dimly lit street. In a search pursuant to a search warrant, Pierce County Forensic Investigator Mary Lou Hanson-O'Brien found three usable fingerprints in the Jeep that matched Reed's fingerprints. Reed was later charged with attempted first degree murder and first degree unlawful possession of a firearm.

¶13 Cihla testified that Reed was her ex-boyfriend. Approximately a month or two before the shooting, she and Reed had purchased a red Jeep Cherokee. A few days before the shooting, a state trooper stopped Reed and told him that, because he had a suspended license, he could not drive home. Contrary to Reed's statement to the police, Cihla

testified that Reed walked home and that Reed's friend brought the Jeep home that same night.

¶14 The day before the shooting, Reed picked Cihla up from work in the red Jeep and they went together to help her aunt move. They returned to their apartment between 9:30 and 10:00 PM and Reed dropped off Cihla and left in the red Jeep.[5] When Reed returned home at approximately 12:00 or 12:30 AM, he seemed upset. When Cihla asked him what was wrong, "He said that he shot a cop. . . . He said he didn't know [why he shot the cop]. He said that he was sorry and that he didn't know why he did it." RP (Apr. 30, 2007) at 130. Reed told her the car had broken down and that "he was underneath the hood looking to see what the problem was and the officer came up and was shining the light, asking for his registration, and he just freaked out."[6] RP (Apr. 30, 2007) at 131.

III. JURY INSTRUCTIONS

¶15 In addition to the charged offenses of first degree attempted murder and unlawful possession of a firearm, the trial court instructed the jury on the lesser included offense of second degree attempted murder. The jury convicted Reed of first degree attempted murder and first degree unlawful possession of a firearm. The jury also returned two special verdicts: (1) that Reed was armed with a firearm at the time of the crime and (2) that Reed knowingly "commit[ted] the offense against a law enforcement officer who was performing his or her official duties at the time of the offense." Clerk's Papers (CP) at 116.

IV. SENTENCING

¶16 At sentencing, the trial court asked Reed if he had anything to say.

---

[5] Cihla's mother told police that she had seen Reed in the red Jeep the day before the shooting incident.

[6] Cihla testified that Reed owned a gun and that he acquired the gun within a month before the shooting. Reed had the gun for protection because the couple had been harassed in the past.

[TRIAL COURT:] Mr. Reed, before sentencing is there anything you'd like to say?

[REED:] No.

[TRIAL COURT:] Mr. Shilley and his family are here.

[REED:] No.

[TRIAL COURT:] I know he'd like to hear something from you.

[REED:] No.

[TRIAL COURT:] Nothing at all after you --

[REED:] Nothing.

[TRIAL COURT:] -- shot a man in the face and --

[REED:] Nothing.

[TRIAL COURT:] -- nobody knows why? Anything you want to say about that?

[REED:] Nothing.

[TRIAL COURT:] Why did you do that? Anything you want to say about that?

[REED:] Nothing.

[TRIAL COURT:] I'm sorry?

[REED:] No comment. I have nothing to say.

RP (June 1, 2007) at 24-25.

¶17 The trial court found that "a departure from the sentencing guidelines is justified [because] RCW 9.9[4]A.535 . . . provides for departure if the victim is an officer performing his duties in the course of his duties and that was known to the defendant." RP (June 1, 2007) at 27. The trial court continued:

[Reed] has shown no real reaction or remorse in this. He's not accepted responsibility for it. Even today he won't say he's sorry. It's very simple. Say you're sorry. He doesn't want to do that. It's important to Mr. Reed, apparently, to be seen as a tough guy or something. I don't know. Tough guys can say they're sorry when they injure someone who doesn't deserve it, and that's the case here.

RP (June 1, 2007) at 28-29. The trial court sentenced Reed to 480 months in prison for first degree attempted mur-

der—with an additional 60 months for the weapons enhancement conviction—followed by 24 to 48 months of community custody. Reed received a concurrent sentence of 30 to 48 months' confinement for first degree unlawful possession of a firearm.

¶18 Reed appeals.

## ANALYSIS

### I. ATTEMPT "TO CONVICT" INSTRUCTION

¶19 Reed argues that the " 'to convict' instruction for attempted first-degree murder omitted an essential element of the crime" when it failed to include the phrase "premeditated intent."[7] Br. of Appellant at 25 (emphasis omitted). "The failure to instruct the jury as to every element of the crime charged is constitutional error, because it relieves the State of its burden under the due process clause to prove each element beyond a reasonable doubt." Br. of Appellant at 25. Reed argues that premeditation is an essential element of the crime of attempted first degree murder because "the only difference between attempted murder in the first degree and attempted murder in the second degree is that the former requires premeditated intent and the latter requires merely intent." Br. of Appellant at 26 (emphasis omitted).

¶20 The State argues that the "to convict" instruction was sufficient because it provided the essential elements for attempted first degree murder: (1) that Reed intended to commit first degree murder and (2) that he took a substan-

---

[7] Reed proposed such an instruction:

To convict the defendant of the crime of attempted murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt: 1) that on or about the 26th day of March, 2006, the defendant did an act which is a substantial step toward the commission of murder in the first degree; 2) that the act was done with intent to commit murder in the first degree; 3) that the defendant acted with intent to cause the death of Gary Shilley; 4) that the intent to cause the death was premeditated; and 5) that the acts occurred in the state of Washington.

RP (May 11, 2007) at 14.

tial step in committing first degree murder. The State argues that there is no requirement that the elements of first degree murder be included in the "to convict" instruction. We agree with the State.

¶21 " '[B]ecause it serves as a yardstick by which the jury measures the evidence to determine guilt or innocence,' " generally the "to convict" instruction must contain all elements of the charged crime. *State v. DeRyke*, 149 Wn.2d 906, 910, 73 P.3d 1000 (2003) (internal quotation marks omitted) (quoting *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). But an erroneous "to convict" instruction may be subject to harmless error analysis. *State v. Carter*, 154 Wn.2d 71, 81, 109 P.3d 823 (2005). If a jury instruction is erroneous but does not relieve the State of its burden to prove every essential element, then the error is harmless. *State v. Brown*, 147 Wn.2d 330, 339-40, 58 P.3d 889 (2002). "[J]ury instructions are sufficient when, read as a whole, they accurately state the law, do not mislead the jury, and permit each party to argue its theory of the case." *State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004). But "a reviewing court may not rely on other instructions to supply the elements missing from the 'to convict' instruction." *DeRyke*, 149 Wn.2d at 910.

II. PREMEDITATION ELEMENT

¶22 Reed relies on *State v. Goble*, 131 Wn. App. 194, 126 P.3d 821 (2005) to support his argument that the "to convict" instruction was erroneous here. Goble was charged with third degree assault. The jury instructions required the jury to find that Goble knew that the alleged victim was a police officer acting in his official capacity at the time of the assault.[8] *Goble*, 131 Wn. App. at 200-02. A separate jury instruction defined "knowledge" and included the following statement: " 'Acting knowingly or with knowledge also is

---

[8] Knowledge is not an element of the crime of third degree assault but, because the State did not object to the instruction requiring knowledge, "this instruction became the law of the case and the State was required to prove the elements" as stated. *Goble*, 131 Wn. App. at 201 & n.2.

established if a person acts intentionally.' " *Goble*, 131 Wn. App. at 202 (emphasis omitted) (quoting *Goble* Clerk's Papers at 44). The knowledge instruction followed 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 10.02, at 206 (3d ed. 2008) (WPIC). Goble argued that this statement "relieved the State of the burden of proving his knowledge of [the officer's] status at the time of the offense" and that the knowledge instruction, as a whole, was "confusing, misleading, and a misstatement of the law." *Goble*, 131 Wn. App. at 202.

¶23 We held that the language stating that intent establishes knowledge "allowed the jury to presume Goble knew [the officer's] status at the time of the incident if it found Goble had intentionally assaulted [the officer]." *Goble*, 131 Wn. App. at 203. The majority also held that the instruction "conflated the intent and knowledge elements required under the to-convict instruction into a single element and relieved the State of its burden of proving that Goble knew [the officer's] status if it found the assault was intentional."[9] *Goble*, 131 Wn. App. at 203.

¶24 Here, the "to convict" instruction followed 11A WPIC 100.01, at 384, which states, "A person commits the crime of attempted (fill in crime) when, with intent to commit that crime, he or she does any act that is a substantial step toward the commission of that crime." The "to convict" instruction in this case, jury instruction 13, stated:

> To convict the defendant of the crime of Attempted Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 25th day of March, 2006, the defendant did an act which was a substantial step toward the commission of Murder in the First Degree;

---

[9] The dissent in *Goble* argued that "the 'to-convict' assault instruction clearly explained that, in order to convict, the jury had to find beyond a reasonable doubt that Goble knew [the officer] was a law enforcement officer" and, therefore, the "lack of a verbatim recitation of the statutory definition of knowledge did not relieve the State of its burden to prove this element." *Goble*, 131 Wn. App. at 205 (Hunt, J., dissenting).

(2) That the act was done with the intent to commit Murder in the First Degree; and

(3) That the acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 97; *see also* 11A WPIC 100.02, at 386. Instruction 9 defined "first degree murder": "A person commits the crime of Murder in the First Degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." CP at 93. A separate instruction defined "premeditation."[10]

¶25 Reed argues that the trial court's failure to include the premeditation element in the "to convict" instruction, even though WPIC 100.01 does not require it, constitutes error. We disagree. Unlike *Goble*, the "to convict" instruction did not confuse the intent necessary to prove an attempt with the premeditated intent required to prove first degree murder. Similarly, it did not relieve the State of its burden to prove the elements of attempted first degree murder.

¶26 Reed's argument conflates the intent necessary to prove an attempt with that necessary to prove first degree murder. The State did not charge Reed with completed first degree murder; thus, to prove only an attempt to commit first degree murder, the State was not required to prove that Reed acted with premeditated intent to commit mur-

---

[10] Instruction 11 defined "premeditation":

Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

CP at 95.

der, only that he attempted to commit murder. Jury instruction 9 defined "first degree murder" as requiring premeditation and jury instruction 11 defined "premeditation." Jury instruction 14 stated, "The defendant is charged in Count One with Attempted Murder in the First Degree. If . . . you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of Attempted Murder in the Second Degree." CP at 98. Therefore, the jury had to consider proof of premeditated intent only to determine which degree of attempted murder Reed committed: first degree or second degree attempted murder.

¶27 Furthermore, the jury instructions allowed both parties to argue their theory of the case. In closing, both parties emphasized the difference between attempted first degree murder and attempted second degree murder, i.e., that first degree attempt required a showing of premeditated intent but that second degree attempt did not.[11] In deliberating, the jury was required first to consider Reed's

---

[11] The State emphasized premeditation in its closing arguments:

[T]he instructions, as a whole, direct your attention at two specific things. That's the "to convict" instruction, one being for attempted murder in the first degree and attempted murder in the second degree. And you'll see from the instructions that the only distinction between those two crimes is the element of premeditation.

Premeditation separates completed murder in the second degree and completed murder in the first degree and also the intent of each of those crimes.

But let's talk about premeditation and intent.

. . . Premeditation focuses on the thought process, thinking and then acting.

RP (May 14, 2007) at 62-63. The State used a baseball metaphor to explain premeditation and then stated, "Premeditation specifically means 'thought over beforehand.' You have the instructions with you. [T]he operative language, the operative thought for premeditation is simply that you thought over about more than a moment in time." RP (May 14, 2007) at 67. The State further discussed premeditation. In all, the record shows at least 15 pages in which the State discussed premeditation in its closing argument.

Reed also focused on premeditation in his closing argument. Reed stated, "The prosecutor is right about one thing in this case, and the whole argument in this case is really about premeditation." RP (May 14, 2007) at 97. "I tell you that this is a tragedy that should not have happened, but it's not attempted murder in the first degree. I submit to you it's attempted murder in the second degree because there was no premeditation." RP (May 14, 2007) at 108. In all, Reed discussed premeditation on at least eight pages of his closing argument.

guilt under the attempted first degree murder "to convict" instruction and necessarily to determine whether the evidence showed premeditated intent to kill Shilley. If the jury was not convinced of Reed's guilt beyond a reasonable doubt as to attempted first degree murder, instruction 14 required the jury to consider his guilt under the "to convict" instruction for attempted second degree murder.[12] The instructions then defined attempted "second degree murder," and "second degree murder," and included the "to convict" for attempted second degree murder.[13]

¶28 The "to convict" instruction did not relieve the State of its burden to prove the actual elements of attempted first

---

[12] Instruction 14 stated, "The defendant is charged in Count One with Attempted Murder in the First Degree. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of Attempted Murder in the Second Degree." CP at 98.

Furthermore, the State ended its closing argument by stating, "If there's any question in your minds or if you have a question about the premeditation aspect of it, it's attempted murder in the second degree." RP (May 14, 2007) at 94.

[13] Instruction 15 defined "attempted second degree murder": "A person commits the crime of Attempted Murder in the Second Degree when, with intent to commit Murder in the Second Degree, he or she does any act which is a substantial step toward the commission of that crime." CP at 99. Instruction 16 defined "second degree murder": "A person commits the crime of Murder in the Second Degree when with intent to cause the death of another person but without premeditation, he or she caused the death of such person or of a third person." CP at 100. The trial court's second degree attempted murder "to convict" instruction, number 17, stated:

To convict the defendant of the crime of Attempted Murder in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 25th day of March, 2006, the defendant did an act which was a substantial step toward the commission of Murder in the Second Degree;

(2) That the act was done with the intent to commit Murder in the Second Degree;

(3) That the acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 101.

degree murder. Furthermore, the instructions accurately stated the law and allowed both parties to argue their theory of the case. *Teal*, 152 Wn.2d at 339. Therefore, Reed's argument that the "to convict" instruction was erroneous fails.

¶29 We affirm the attempted first degree murder conviction but remand to give the sentencing court an opportunity either to reimpose the exceptional sentence based on proper aggravators or to reduce Reed's sentence.

¶30 The balance of this opinion having no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

ARMSTRONG and HUNT, JJ., concur.

Review denied at 167 Wn.2d 1006 (2009).