IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36132-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MARTIE M. SODERBERG, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Martie Soderberg appeals her conviction for attempted first degree murder on the primary basis that the evidence failed to establish she took a substantial step toward the slaying. We reject this and other arguments of Soderberg and affirm her convictions for attempted murder and solicitation for murder.

FACTS

We glean our facts from trial testimony, including audio recordings between Martie Soderberg and informant Martin Drake played to the jury. Defendant Martie Soderberg and alleged victim Russell Soderberg married in 2002. At the time of Martie

Soderberg's trial, the two were still married. Martie Soderberg respectively contacted two men, Dennis Bjerke and Martin Drake, to slay Russell.

Martie Soderberg first contacted Dennis Bjerke to kill her husband. Bjerke and Martie Soderberg had known each other for fifteen years. Bjerke and Russell had worked together at two different businesses. In the summer of 2016, Soderberg asked Bjerke to murder Russell by shooting him on Halloween. Soderberg commented that she would collect life insurance benefits on her husband's death. Bjerke responded: "[Y]ou're out of your mind, this is not like you, this is not normal." Report of Proceedings (RP) (Mar. 21, 2018) at 163. Soderberg on four later occasions repeated her request to Bjerke, who each time declined the solicitation for his assistance.

After rejections from Dennis Bjerke, Martie Soderberg sought assistance from informant Martin Drake. Drake and Soderberg met years earlier in high school. In July 2016, Soderberg fortuitously contacted Drake on Facebook. In October 2016, Drake was homeless. He slept under a picnic table near some trees behind a medical building.

On October 11, 2016, Martie Soderberg asked Martin Drake to kill her husband. Soderberg discussed different methods for the murder.

On October 11, after solicitation from Martie Soderberg, Martin Drake anonymously called law enforcement and asked to speak with homicide detectives about a

murder.  In response, Spokane County Deputy Sheriff Gavin Pratt met Drake behind a

ubiquitous Walmart on East Broadway in Spokane Valley.  Drake told Deputy Pratt that

he wished to report a murder that had yet to transpire.  According to Pratt, a nervous and

frightened Drake eagerly related his conversations with Martie Soderberg.  Pratt took

Drake to the Spokane Valley precinct office to conduct a thorough interview.

Spokane County Sheriff detectives John Oliphant and Mark Melville interviewed

Martin Drake at the precinct office.  Drake recounted the story of Martie Soderberg's

request to kill her husband, and Drake identified Soderberg from a photo montage as the

woman who sought his services.  Because of the threatened life of Russell Soderberg,

detectives moved briskly with an investigation and sting of Martie Soderberg.

In the early morning of October 12, 2016, Detective John Oliphant applied for and

obtained an intercept order to record conversations between Martin Drake and Martie

Soderberg.  Later that morning detectives met with Drake and planted a cellphone in

Drake's pocket, which cellphone included a microphone that sent audio to another phone

that recorded the audio.  Detectives Oliphant and Melville controlled the second

cellphone.

Martin Drake arranged to meet Martie Soderberg mid-morning on October 12.

Detectives John Oliphant and Mark Melville left Drake two blocks from the Spokane

Valley Walmart. The two detectives then parked in an unmarked car in the Walmart

parking lot and waited in the vehicle. Drake walked the two blocks to the store parking

lot. At 10 a.m., Soderberg arrived in a Toyota Camry Solara convertible. Detective

Melville video recorded the interaction at the parking lot between Soderberg and Drake.

Drake entered the convertible, and Soderberg drove away.

For the next three and one-half hours, Martie Soderberg and Martin Drake drove

around Spokane Valley and the Hillyard area of Spokane before returning to the Walmart

parking lot. Detectives John Oliphant and Mark Melville followed, in their car,

Soderberg's Solara as it traveled from location to location. Other detectives followed at

various locations, and a helicopter circled overhead in the event officers following in cars

lost the trail of Soderberg. Because of a potential murder, law enforcement did not wish

to lose surveillance of either Soderberg or Drake.

Law enforcement recorded the conversation of Martie Soderberg and Martin

Drake during the October 12 excursion on the streets of Spokane and Spokane Valley.

During the trip, Soderberg commented to Drake that, over the past year, she had schemed

with friend Dennis Bjerke to kill Soderberg's husband, but she and Bjerke never finalized

plans. Soderberg then shared alternative plans with Drake to kill her husband. Soderberg

boasted that she had "thought of everything." Ex. P-7, at 3 min., 47 sec. to 3 min., 53 sec.

4

She did not wish to personally kill her husband because police always first suspect the spouse as the murderer.  Martie suggested one scenario, under which Martin Drake would shoot Russell Soderberg while Russell accompanied his and Martie's children while trolling for candy on Halloween evening.

During their Solara dialogue, Martie Soderberg and Martin Drake considered killing Russell at a rest stop or killing him at his business to convey the appearance of a robbery or burglary.  They spoke of escape routes from the location of the business.  The two conferred on procuring a firearm, alibis for Drake, disguises for Drake, methods of disposing of the murder weapon, and techniques to eliminate blood and gunshot residue from Drake's hands.  Soderberg mentioned buying a firearm from Craigslist or from Idaho.  She remarked that she could have stolen a gun from her brother if the thought had come to her mind when recently visiting him.  Soderberg volunteered that she maintained a gun safe and Russell lacked a key or the combination to the safe.  Soderberg proposed that Drake wear disposable clothing in the event gun residue collected on his clothing.  She further suggested that Drake deposit the homicide weapon in a bucket filled with wet cement.  She believed Drake's mixing of the cement with his hands would remove any remaining blood or gun residue.

5

During the three and one-half hour journey, Martie Soderberg told Martin Drake of a $300,000 life insurance policy on her husband's life. Martie asked Drake to review the fine print of the policy to confirm that the insurance company would pay the proceeds immediately on Russell's death. Martie reviewed potential methods of killing Russell in order to assure insurance payment. She added that she would receive a worker compensation settlement in the event of Russell's death.

During the Spokane travel, Martie Soderberg generously offered to wed Martin Drake in the future. She queried Drake on whether he could father children.

The following colloquies occurred during the recorded conversations on October 12:

> [Soderberg:] To me it's going to take two to four months to at least plan this all the way.

Ex. P-6, at 9 min., 52 sec. to 9 min., 57 sec.

> [Soderberg:] So did you get fixed? . . . So you can still have kids? Seriously?

Ex. P-6, at 17 min., 50 sec. to 17 min., 58 sec.

> [Soderberg:] Would you get married to me?
> [Drake:] Yeah, I thought that was the plan.

Ex. P-6, at 18 min., 35 sec. to 18 min., 41 sec.

[Soderberg:]  There can't be no links, no connections, no nothing. Okay. . . .  Originally, I don't want to walk into a store to buy a gun.

Ex. P-6, at 26 min., 28 sec. to 26 min., 42 sec.

[Soderberg:]  See and he's supposed to have, he's supposed to—he's supposed to be able to know people to where he can buy one, but I don't even know if I want to use him to buy one, I mean, I don't want nothing fucked up.
[Drake:]  Well, I want, I probably want to get this a little ahead of time so I can go out and use, I want to be able, . . .
[Soderberg:]  Practice and what not.
[Drake:]  Be familiar with it.

Ex. P-6, at 27 min., 10 sec to 27 min., 35 sec.

[Soderberg:]  That's why I told him [Dennis Bjerke] originally when I planned . . . we've had this frickin' in the works for frickin' I don't know a year or so, and I just could never say yeah go ahead . . . maybe we should do it on Halloween.

Ex. P-6, at 27 min., 39 sec. to 27 min., 58 sec.

[Soderberg:]  I mean in all reality, yes, we can both go to jail right now just for talking about something like this.

Ex. P-6, at 31 min., 13 sec. to 31 min., 17 sec.

[Soderberg:]  All I can do is check with you from time to time and tell you places where I know places he [Russell Soderberg] will be and whatnot and when it happens it happens.

Ex. P-6, at 31 min., 52 sec. to 32 min., 2 sec.

[Soderberg:]  Your biggest thing is, when you do it, make sure you have somethin' on that you can totally take off, and dispose of, get it gone.

Ex. P-6, at 33 min., 25 sec. to 33 min., 38 sec.

> [Drake:] Right. Yeah.
> [Soderberg:] That's why A, there's no blood, there's no, . . .
> [Drake:] Gunpowder residue.
> [Soderberg:] Yep.
> . . . .
> [Soderberg:] You know what my theory is, my theory is, you're gonna end up keepin' the fucker on ya, but not like that, when I say keep it on you I mean like, whatever vehicle that I can come up with to get you to point A to point B, have like a bucket in the back, a bag of concrete, heh, a fuckin' gallon of water,
> [Drake:] Mix that and,
> [Soderberg:] No! I'm serious!
> [Drake:] Yeah, yeah, that's good thinkin'.
> [Soderberg:] And I mean after it's done, get away so far and then,
> [Drake:] (Unintelligible)
> [Soderberg:] Pull over somewhere and fuckin' mix a batch up real quick and make it look like you're frickin' doin' a—a concrete job or whatever you see what I'm sayin'?
> [Drake:] Right.

Ex. P-6, at 33 min., 38 sec. to 35 min., 1 sec.

> [Soderberg:] It's stupid! That's why I was surprised he let me frickin' (unintelligible) on him . . . (unintelligible) cause it's one of those things where I'm not in a total big hurry.
> [Drake:] Right.
> [Soderberg:] As long as it's done before summer, but I mean, months . . .
> [Drake:] What summer?
> [Soderberg:] . . . and months can go by, summer? Like June.
> [Drake:] I know, but why would you want it done before then?
> [Soderberg:] Why do I wanna wait an entire nother year?

Ex. P-6, at 36 min., 50 sec. to 37 min., 26 sec.

> [Soderberg:] Yeah, now I just have to worry about buying my thing and fuckin' cause everything has to frickin' worked out before, way before.
> [Drake:] What thing?
> [Soderberg:] A "G."
> [Drake:] Oh. Heh.
> [Soderberg:] See what I'm sayin?
> [Drake:] Yeah.
> [Soderberg:] It's gotta, I mean, if you went and got it two, three, four months prior then, . . .
> [Drake:] Well, I mean—I don't need it, that, that soon, I just want it a week or so.
> [Soderberg:] But do you see?
> [Drake:] Before so I can shoot it and be able to. . .
> [Soderberg:] But do you see what I'm sayin'? The sooner I can get my hands on somethin' like that, the better.

Ex. P-7, at 23 sec. to 1 min., 2 sec.

> [Drake:] Well, I can even meet. . .
> [Soderberg:] Somehow.
> [Drake:] . . . meet somebody. . .
> [Soderberg:] Some way.
> [Drake:] . . . in the parking lot of 711's up here or wherever and fuckin' buy the gun.
> [Soderberg:] Well and I want to buy you, I want to buy you a wig too, cause when you do it you don't want to be in your full regular appearance.

Ex. P-7, at 3 min., 33 sec. to 3 min., 47 sec.

> [Soderberg:] Trust me, if I knew I could get away with it and do it, hey it would have already fuckin' been done. But I already know that there's no possible way because the first person is the spouse, they always

9

come right back to the spouse. . . . And then my next option was doin' a
for-hire thing.

Ex. P-7, at 5 min., 31 sec. to 5 min., 53 sec.

At 1:30 p.m. on October 12, Martie Soderberg returned Martin Drake to the

Walmart store in Spokane Valley. Detective Mark Melville then escorted Drake to the

sheriff precinct office, where the two and other detectives listened to the audio recording

and devised future plans to apprehend Martie Soderberg. Detectives decided that Drake

would facilitate Soderberg's purchase of a gun.

On October 13, 2016, Martin Drake and Martie Soderberg met at a Shari's

Restaurant. Drake did not then possess the transmitting cellphone. The two did not

mention Russell Soderberg.

On October 17, 2016, Martin Drake contacted Martie Soderberg and notified her

of good news. Drake asked Soderberg to bring $50 to him, and the two decided to meet

at a gas station. Before Drake met Soderberg, detectives searched Drake for any cash or

firearms and handed him the recording device. Detectives John Oliphant and Mark

Melville deposited Drake near the service station and then parked their unmarked vehicle

in the Walmart parking lot. Soderberg arrived at the gas station in a pickup truck, and

Drake entered her vehicle. Law enforcement recorded Soderberg's and Drake's

conversation.

Below are excerpts from the October 17, 2016 recording:

>[Soderberg:]  So where'd you apply at?
>[Drake:]  Winco, I think I got, uh, [. . .]—it's nights, but, uh, did you bring fifty bucks?
>[Soderberg:]  For what?
>[Drake:]  For the gun, I found this revolver, we won't have to worry about the shell casings nothin', dude's goin' back to North Dakota, and he's sellin' it, he's got a couple rifles, couple wi-for fifty bucks, if we need any.
>[Soderberg:]  (unintelligible)
>[Drake:]  It's quiet, it's, don't have to worry about the casings and but you're gonna have to hang onto it, put it in your safe or whatever, cause I can't be packin' that around.
>[Soderberg:]  Yes.
>. . . .
>[Drake:]  He said he'll be at Walmart at ten.  And it's ten now.
>[Soderberg:]  Today?
>[Drake:]  Yeah, right now, that's why I asked if you had the fifty bucks.

Ex. P-8, at 19 sec. to 1 min., 9 sec.

>[Soderberg:]  Um, I'm really thinking his job, cause I mean, it's just one of those things where you'll have to stake it out, but he like leaves the house about six, six-twenty.
>[Drake:]  Right.
>[Soderberg:]  And he doesn't go to the shop all the time.
>[Drake:]  Is there a lot of people at the shop?
>[Soderberg:]  That's the thing, in the morning there's like I'll—I'll drive you up, well, I won't drive you by his shop today.
>[Drake:]  Heh, heh, heh.
>[Soderberg:]  When I find out the next time when I hear that he's workin' out of town, I'll drive you by his shop and I'll show you what's around in the area.
>[Drake:]  Cause if he,

[Soderberg:]  It's just down the street from where you worked fuckin' at, um, Cascade.

[Drake:]  Ok, so it could be like I burglarized the shop, he shows up, boom, and,

[Soderberg:]  Mm, hmm.

[Drake:]  That'd cover it.

[Soderberg:]  Yes!

[Drake:]  Awesome.

[Soderberg:]  I mean, you got, next door you have. . . .

[Drake:]  Is it, where I can get the fuck outta there though?

[Soderberg:]  That's what I'm saying, you'll have to look at the area, but, um, yeah, so like if you had . . . .

[Drake:]  And then he's at work, and you will get that other policy.

[Soderberg:]  If you had a, exactly!  I mean, yeah, that would work out just, that would work out really good, I mean, being right there, just because, but see the thing is I don't know if there's cameras throughout other businesses, you see what I'm sayin'.

Ex. P-8, at 11 min., 2 sec. to 12 min., 24 sec.

During the second recorded rendezvous, Martin Drake delivered the gun to Martie Soderberg in exchange for Soderberg handing Drake $50.  She showed him an insurance policy on her husband.  Soderberg then drove her car to the Walmart parking lot, where Drake exited the car.  Drake walked over to the unmarked police car.  As he approached, Drake fanned the cash in his hands and entered the back seat of the unmarked car.  Drake handed the currency to the detectives and informed them that it came from Soderberg.  Detective Oliphant radioed other officers, and those officers arrested Soderberg.

On October 18, 2016, law enforcement officers executed search warrants for Martie Soderberg's residence, Camry, and pickup truck. During the search of the vehicles, Detective John Oliphant seized Russell Soderberg's life insurance policy wedged between the front passenger seat and the center console of the pickup truck. Detectives found two safes located in the master bedroom of the Soderberg residence.

PROCEDURE

The State of Washington charged Martie Soderberg with attempted murder in the first degree *or, in the alternative*, solicitation to commit murder in the first degree. By an amended information, the State charged Soderberg with attempted murder in the first degree *and* solicitation to commit murder in the first degree.

Martin Drake testified at trial. During his direct examination, Drake denied any sexual or romantic relationship with Martie Soderberg. He mentioned, however, the two discussed a potential future amorous association. On cross-examination, Drake denied intentionally leading Soderberg to utter incriminating statements, although he conceded texting her to meet him and bring $50 to purchase the gun. Drake averred that Soderberg spoke only about procuring a gun in the context of killing her husband.

Martie Soderberg testified in her own defense. She insisted that she loved her husband and that she never intended for Martin Drake to kill her husband. On cross-

13

examination, Soderberg admitted to her female voice being heard on the recordings

played to the jury. She qualified her admission by remarking:

> That was my voice being stupid, saying stupid shit that I—. . .—
> should have probably never said.

RP (Mar. 21, 2018) at 222. Soderberg admitted to commenting to Drake about wanting a

firearm with no shell casings and to telling Drake that she had no conscience. She

blamed Drake in leading her to make incriminating statements:

> [Defense Attorney] Q: He was taking the lead on the discussions.
> [Ms. Soderberg] A: Yeah. It was like he was—I call it fishy,
> leading, however you want to say it. I felt like he was literally pulling stuff
> out of me, yes.

RP (Mar. 21, 2018) at 230-31. Soderberg conceded to buying a $300,000 life insurance

policy on her husband.

The trial court's jury instruction 8 read:

> A person commits the crime of attempted murder in the first degree
> when, with intent to commit that crime, he or she does any act that is a
> substantial step toward the commission of that crime.

Clerk's Papers (CP) at 116. The trial court's "to convict" jury instruction, instruction 9,

read, in pertinent part:

> (1) That on or about between October 11, 2016 and October 17, 2016
> the defendant did an act that was a substantial step toward the
> commission of murder in the first degree;

14

          (2) That the act was done with the intent to commit murder in the
              first degree; and
          (3) That the act occurred in the State of Washington.

CP at 117.  Jury instruction 12 defined "substantial step" as:

          conduct that strongly indicates a criminal purpose and that is more
than mere preparation.

CP at 120.

     During closing argument, the State characterized, as part of the preparation stage

of the attempt to murder, Martie Soderberg's propositions to Dennis Bjerke, her

purchasing of the life insurance policy, and the propositioning of Martin Drake to slay her

husband.  The State then added:

          Those are—those were preparation, the discussion that went into
this, the underlying planning.  There's planning about—about weapons and
planning about where to do it and what would be the insurance payout if it
happened under certain circumstances as opposed to other ones.
          But then the defendant took a substantial step when she drove Martin
Drake to buy the revolver and she gave him the money to purchase the
revolver.

RP (Mar. 22, 2018) at 296.

     During summation, the State also explained the items of value offered to Martin

Drake by Martie Soderberg in exchange for the murder of her husband:

          So number one is that the defendant offered to give money or other
thing of value to another to engage in specific conduct.  Remember when
Martin Drake testified he talked about what Martie Soderberg had offered

him going forward and that was—that was to stay with her and—and be with her and have a romantic relationship; maybe not immediately after Russell was dead but they'd kind of wait a couple months, kind of lay low. And he even mentioned something on the tape about, yeah, that would work—I'm paraphrasing here—that would work because it's like I'm an old friend and I got ahold of you and we—you know, we—I was there to comfort you and now we wound up having a romantic relationship.

One thing to keep in mind with this is Martin Drake's situation prior to that. He's sleeping under a picnic table in a park by the Valley Medical Center, and here is the opportunity to have a girlfriend, maybe a wife, because remember she talks about do you think you'd want to marry me, about having a place to live; not only having a girlfriend or a wife, but having one who just came into a lot of money, has big plans for opening a business and building a different house and building a—some sort of pole building for her—for her business.

Not only did she offer that future to him, but she started, I guess kind of in a way, grooming him for that right then because now, well, she's going to take care of him, she's going to loan him some money so that he can go stay with Dennis. So she's going to put him up, she's going to get him out of the park and out from under the picnic table and put him up somewhere. And she's going to—she brings over groceries to Dennis' house and she takes care of him. And she's giving him rides and she's, you know, interacting with him in that way.

That was the thing of value that he was looking forward to there. That's what she was offering, is the chance to be with her going forward, have a relationship with her and not be under a picnic table anymore, to be—to be hooked up with this woman who just came into $300,000 if Mr. Drake did his part.

RP (Mar. 22, 2018) at 309.

The jury found Martie Soderberg guilty of attempted murder in the first degree and criminal solicitation to commit murder in the first degree. At sentencing, the trial court ruled that both crimes consisted of the same criminal conduct for purposes of Soderberg's

16

offender score. The court sentenced Soderberg to 180 months' confinement. The

sentencing court imposed a $500 victim assessment fee, a $200 criminal filing fee, and a

$100 DNA collection fee.

LAW AND ANALYSIS

Sufficiency of Evidence – Attempted Murder

On appeal, Martie Soderberg challenges the sufficiency of the evidence for her

conviction for attempted murder in the first degree. She contends the evidence does not

support a finding that she took a substantial step toward the commission of the crime. In

response, the State argues that Soderberg's purchase of a gun for the purpose of killing

Russell constituted a "substantial step" for purposes of the inchoate crime of attempted

murder. Although the State concedes that other actions of Soderberg by themselves do

not constitute a substantial step, the State asks us to consider Soderberg's other measures

in combination with the purchase of the gun. We agree with the State that Soderberg's

purchase of a gun qualifies as a "substantial step," but we issue such a ruling only after

including and adding other steps of Soderberg.

In reviewing a challenge to the sufficiency of the evidence, the court asks if, after

viewing the evidence in a light most favorable to the State, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt. *State v.*

17

*Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980) (plurality opinion). We draw all reasonable inferences from the evidence in favor of the State and interpret those inferences most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

A person commits murder in the first degree when, "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person." RCW 9A.32.030(1)(a). This appeal focuses not on the elements of first degree murder, but on the attempt to commit a crime.

RCW 9A.28.020(1) describes the inchoate crime of attempt:

> A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime.

The mens rea of an attempt to commit a crime is the intent to accomplish the criminal result of the base crime. *State v. DeRyke*, 149 Wn.2d 906, 913, 73 P.3d 1000 (2003). We look to the definition of the base crime, in this case murder in the first degree, for the requisite criminal result. *State v. Johnson*, 173 Wn.2d 895, 899, 270 P.3d 591 (2012). A person commits first degree attempted murder when, with premeditated intent to cause the death of another, she takes a substantial step toward commission of the act. *State v. Price*, 103 Wn. App. 845, 851-52, 14 P.3d 841 (2000).

This appeal focuses on the "substantial step" element of attempt to commit first degree murder. Washington law defines a "substantial step" as conduct "'strongly' corroborative of the actor's criminal purpose." *State v. Johnson*, 173 Wn.2d at 899 (2012) (quoting *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205 (2006)). Any slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime. *State v. Price*, 103 Wn. App. at 852 (2000). The need for further major steps before completion of the crime does not preclude a finding that steps already undertaken are substantial. Model Penal Code § 5.01, cmt. 6(a) (AM. LAW INST. 1985).

Intent alone to commit a crime is not punishable. *State v. Lewis*, 69 Wn.2d 120, 124, 417 P.2d 618 (1966). The intent must coincide with some overt act adapted to, approximating and which, in the ordinary and likely course of events, will result in the commission of the target crime, reaching far enough toward its accomplishment to amount to the commencement of the consummation. *State v. Lewis*, 69 Wn.2d at 124. Mere preparation to commit a crime does not qualify as a substantial step. *State v. Workman*, 90 Wn.2d 443, 449-50, 584 P.2d 382 (1978); *State v. Lewis*, 69 Wn.2d at 124. The conduct of the accused, while it need not be the last act necessary to the consummation of the intended crime, must approach sufficiently near the completion to

19

stand as a direct movement toward the commission of the offense after making

preparations. *State v. Lewis*, 69 Wn.2d at 124-25. In determining when preparation

ceases and attempt begins, the law does not afford a rigid formula. *State v. Lewis*, 69

Wn.2d at 125. Each case hinges on its own facts and circumstances. *State v. Lewis*, 69

Wn.2d at 125.

We issue no ruling that the purchase of a gun by itself constitutes a substantial

step. Instead we hold that the purchase of a gun under the circumstances of Martie

Soderberg's attempts to garner an accomplice, the purchase of life insurance, and

substantial planning to kill her husband qualified the procurement of the gun as a

substantial step.

In *State v. Workman*, 90 Wn.2d at 451-52 (1978), our high court adopted the

Model Penal Code (MPC) approach to "substantial step." Under the MPC, conduct is not

a substantial step "unless it is strongly corroborative of the actor's criminal purpose."

MPC § 5.01(2). The *Workman* court cited to the subsection of the MPC and listed

examples of conduct that could constitute a substantial step. Those examples include:

> (a) lying in wait, searching for or following the contemplated victim of the crime;
> (b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;
> (c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

*State v. Workman*, 90 Wn.2d at 451-52 n.2.

Martie Soderberg fulfilled some of these activities, any one of which, according to the MPC, could qualify as a substantial step. She solicited two agents to commit the murder. She purchased material for the commission of the crime. According to the testimony of Martin Drake, the purchased gun served no purpose other than to kill Russell Soderberg.

Martie Soderberg emphasizes that the undisputed evidence showed that Martin Drake and she did not intend to commit the murder until months into the future. Assuming the accuracy of this factual premise, Soderberg identifies no law that imposes a limitation period before which one's activities cannot constitute a substantial step for purposes of an attempt to commit a crime.

Martie Soderberg also underscores that Drake lacked knowledge of the physical appearance of Russell Soderberg and had never traveled to a location where Russell was present, such that the duo of Martie Soderberg and Martin Drake needed further preparation to commit a murder. Such preparation would include Soderberg's identification of Russell, the purchase of a wig, the purchase of ammunition, and target practice. Nevertheless, Soderberg cites no cases that require such additional steps to be in existence for the execution of a substantial step.

We deem *State v. Gay*, 4 Wn. App. 834, 486 P.2d 341 (1971) instructive. Olga Gay hired an undercover police officer to kill her husband. A jury found her guilty of attempted murder in the first degree. This appeals court concluded that the wife's intent to murder her husband was clearly established by a forged assignment of an insurance policy on her husband's life six months before she hired a man to kill her husband, payment without her husband's knowledge of premiums on the husband's $50,000 life insurance policy after commencing divorce, and the the hiring of the feigned assassin with a $1,000 retaining fee, furnishing of photographs of her husband to her ersatz hit man, and informing the killer of places that her husband frequented. The court noted that any slight overt acts in furtherance of the intent to murder establishes the crime of attempt to commit first degree murder. The court reasoned that Gay had performed all acts she

needed to complete to accomplish the murder.  The "situation was then beyond her control."  *State v. Gay*, 4 Wn. App. at 842.

We recognize that Martie Soderberg may have needed to take additional steps before ending her role in preparing for the murder of Russell.  She probably needed to give Martin Drake photographs of her husband and may have needed to identify a location or locations at which to shoot Russell.  Still, strong evidence shows that Soderberg needed to complete few additional steps to consummate the assassination.  Drake could have purchased bullets on his own.  He possessed the gun needed to complete the killing.  Any wig or concrete did not necessarily further the murder as much as they furthered an avoidance of capture for the homicide.  A participant in an attempt to commit a crime need not have performed all of her tasks in order to be found guilty.

As in *State v. Gay*, Martie Soderberg procured insurance on the life of her husband, and she expected to benefit from the death.  She probably did not pay Martin Drake for his services, but she anticipated giving him her loving arms and tender care after the death of Russell.  Her comments on the audio recordings confirmed a strong desire for the death of her husband in addition to substantial contemplation and preparation toward this desire.

We find two foreign decisions that declare that the procurement of a gun alone

does not constitute a substantial step toward attempted murder. *Rainey v. State*, 338 Ga.

App. 413, 790 S.E.2d 106 (2016); *People v. Johnson*, 57 Cal. 4th 250, 303 P.3d 379, 159

Cal. Rptr. 3d 70 (2013). Both statements so declare in dictum, however. *Rainey v. State*

involved an attempt to commit robbery, not charges of attempt to commit murder. In

*People v. Johnson*, the accused actually killed some rival gang members and shot at

others during a gang fight. Assuming the validity of a rule that precludes liability for

attempted murder solely for the possession of a gun, other evidence in Martie Soderberg's

prosecution, which we have identified, combined with the purchase of the firearm

confirm a finding of a substantial step.

### Jury Instruction 9

The trial court's to-convict instruction 9 states:

> (1) That on or about between October 11, 2016 and October 17, 2016 the defendant did an act that was a substantial step toward the commission of murder in the first degree;
> (2) That the act was done with the intent to commit murder in the first degree; and
> (3) That the act occurred in the State of Washington.

CP at 117. Martie Soderberg argues the instruction violates her right to due process

because it described the mental element as "intent" instead of "premeditated intent."

Therefore, Soderberg argues that, if this court does not dismiss the first degree attempted

24

murder charge for insufficient evidence, we should reverse the conviction and remand for

a new trial.

Martie Soderberg did not object to the "to convict" instruction in the trial court.

Nevertheless, an instruction that omits an essential element of a crime relieves the State

of its burden of proving each element of the crime beyond a reasonable doubt. *State v.*

*Chino*, 117 Wn. App. 531, 538, 72 P.3d 256 (2003). Because jury instructions that omit

elements of the crime charged constitute a manifest error affecting a constitutional right,

we consider this challenge for the first time on appeal. RAP 2.5(a)(3); *State v. Chino*,

117 Wn. App. at 538.

Because the to-convict instruction serves as a yardstick by which the jury measures

the evidence to determine guilt or innocence, the "to convict" instruction must generally

contain all elements of the charged crime. *State v. DeRyke*, 149 Wn.2d 906, 910, 73 P.3d

1000 (2003). This court may not rely on other instructions to supply the missing elements

from the to-convict instruction. *State v. DeRyke*, 149 Wn.2d at 910.

We reject Martie Soderberg's assignment of error with regard to a faulty to-convict

instruction based on this court's rulings in *State v. Reed*, 150 Wn. App. 761, 208 P.3d

1274 (2009) and *State v. Boswell*, 185 Wn. App. 321, 340 P.3d 971 (2014). In *State v.*

*Reed*, Tremayne Reed argued that the "to convict" instruction for attempted murder in the

first degree was improper because it omitted an essential element of the crime when it failed to include the phrase "premeditated intent." The *Reed* court held that the essential elements of attempt are: (1) the specific intent to commit a crime and (2) a substantial step toward committing that crime. *State v. Reed*, 150 Wn. App. at 772-73. The court explained:

> Reed's argument conflates the intent necessary to prove an attempt with that necessary to prove first degree murder. The State did not charge Reed with completed first degree murder; thus, to prove only an attempt to commit first degree murder, *the State was not required to prove that Reed acted with premeditated intent to commit murder*, only that he attempted to commit murder.

*State v. Reed*, 150 Wn. App. at 772-73 (emphasis added). Therefore, this court held the "to convict" instruction did not relieve the State of its burden to prove the actual elements of attempted murder in the first degree.

This court, in *State v. Boswell*, found *Reed* controlling. Accordingly, the court held a jury instruction identical to Martie Soderberg's jury instruction 9 properly instructed the jury on the essential elements of attempt.

We follow the reasoning of *State v. Boswell* and *State v. Reed*. The State did not charge Martie Soderberg with completed first degree murder. Therefore, to prove an attempt to commit murder in the first degree, the State only had to prove she attempted to commit murder. The to-convict instruction did not omit an essential element of the crime.

26

Jury Instruction 8

Martie Soderberg also complains about jury instruction 8. The instruction read:

> A person commits the crime of attempted murder in the first degree when, with intent to commit *that crime*, he or she does any act that is a substantial step toward the commission of *that crime*.

CP at 116 (emphasis added). According to Soderberg, the instruction contains a grammatical error. The term "that crime" did not expressly identify what constituted that crime. Therefore, according to its use in the sentence, "that crime" refers to attempted first degree murder. Accordingly, according to Soderberg, the trial court instructed the jury to convict her of attempt to commit murder if she performed a substantial step toward committing attempt to commit first degree murder, not a substantial step toward committing murder.

We agree the jury instruction 8 reads awkwardly and illustrates the danger of use of pronouns. Nevertheless, we suspect the jury understood that "that crime" referred to murder, not attempt to commit murder. Regardless, we decline to review Martie Soderberg's assignment of error on another ground. Soderberg never objected to jury instruction 8 at trial.

27

Under RAP 2.5(a), an appellate court may refuse review of an assigned error not asserted at the trial court. An exception to the rule is manifest constitutional error. We find no manifest constitutional error.

Martie Soderberg asserts manifest constitutional error on the basis that the jury instruction failed to properly inform the elements of the charged crime. We disagree. Any error in defining terms used in the elements is not of constitutional magnitude. *State v. Stearns*, 119 Wn.2d 247, 250, 830 P.2d 355 (1992).

Jury instruction 10 informed the jury of the elements of first degree murder being causing one's death with premeditated intent. The instruction obviously followed the to-convict instruction, instruction 9. Instruction 11 defined "premeditated." CP at 119. And then instruction 12 defined "substantial step." CP at 120. There are no errors in defining the offense of attempted first degree murder, let alone manifest constitutional error.

Martie Soderberg relies solely on *State v. Smith*, 131 Wn.2d 258, 930 P.2d 917 (1997). *Smith* involved a defective to-convict instruction, to which the State conceded error on appeal. The State charged Shelley Smith with conspiracy to commit murder in the first degree. The to-convict instruction misstated the elements of conspiracy to commit murder by stating the wrong crime as the underlying crime that the conspirators agreed to carry out. Soderberg's instruction 8 did not specifically identify the wrong

crime as the underlying crime. *State v. Pittman*, 134 Wn. App. 376, 381, 166 P.3d 720

(2006) involves a similar jury instruction that referenced an attempt to commit "that

crime." This court found no error, let alone constitutional error.

## Unanimous Verdicts

Martie Soderberg next contends, for the first time on appeal, that the trial court

denied her the right to unanimous jury verdicts because the court provided no unanimity

instruction with respect to the charges of attempted first degree murder and the

solicitation to commit first degree murder. Along these lines, she contends that the State

identified numerous acts that could have constituted a substantial step for purposes of

committing attempted murder and different jurors could have relied on different actions to

find her guilty. She also complains that the State identified numerous offers of value

given by Soderberg to Martin Drake and that different jurors could have relied on

different offers to convict her of solicitation.

Washington criminal defendants have a right to a unanimous jury verdict. WASH.

CONST. art. I, § 21; *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994).

In turn, when the prosecution presents evidence of several acts that could form the basis

of one count charged, either the State must tell the jury which act to rely on in its

deliberations or the court must instruct the jury to agree on a specific criminal act. *State*

*v. Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988).  Stated differently, to adequately protect jury unanimity, the State must either (1) elect the specific act on which it relies for the crime charged, or (2) the court must give the jury a "*Petrich*" instruction, explaining that all twelve jurors must agree that the the State proved the same underlying criminal act beyond a reasonable doubt.  *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *abrogated in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

Failure to follow one of these options is error, violative of a defendant's state constitutional right to a unanimous jury verdict and United States constitutional right to a jury trial.  *State v. Kitchen*, 110 Wn.2d at 409.  Therefore, the failure to give a unanimity instruction may be raised for the first time on appeal because it is a manifest constitutional error.  *State v. Kiser*, 87 Wn. App. 126, 129, 940 P.2d 308 (1997).

The requirement for either an election by the State or a *Petrich* instruction applies only when the State presents evidence of "several distinct acts."  *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989).  The rule also does not apply when the evidence indicates a "continuing course of conduct."  *State v. Handran*, 113 Wn.2d at 17.  To determine whether there is a continuing course of conduct, this court looks at the facts and considers (1) the time separating the criminal acts and (2) whether the criminal acts

30

involved the same parties, location, and ultimate purpose.  *State v. Brown*, 159 Wn. App. 1, 14, 248 P.3d 518 (2010).  We rely on the lack of multiple acts rule when rejecting Martie Soderberg's argument with regard to the charge of attempted first degree murder. We rely on the continuing course of conduct rule when rejecting her challenge with regard to the solicitation of murder charge.

Martie Soderberg underscores that the court never instructed the jury that it had to be unanimous as to which of her specific actions between October 11 and October 17, constituted the "substantial step" required to convict her of attempted murder. Nevertheless, in its closing argument, the State told the jury that Martie Soderberg took several actions that entailed mere preparations for the murder, not a substantial step.  The State only identified one action, the payment of money for the purchase of the gun and giving Martin Drake possession of the gun, that constituted the substantial step qualifying for the crime of attempt.  Since the State only presented evidence and argument of one act constituting a substantial step and the unanimity instruction is needed only with multiple, distinct acts, we hold no *Petrich* instruction was needed.

Martie Soderberg highlights that the court never instructed the jury that it had to be unanimous as to what constituted "money or other thing of value" required to convict her of attempted murder or solicitation.  In response, the State argues that several acts

31

supporting the charged crimes against Martie Soderberg constituted a continuing course of conduct. The State emphasizes that the acts involved the same parties: Martie Soderberg, Martin Drake, and her husband. The acts involved the same location, Soderberg's vehicle. Soderberg's actions and words during that period of time remained consistent and indicated the same motive and criminal objective, to have her husband killed. Soderberg continued to engage with Drake and plan with Drake to commit murder with implied assurances of a large insurance payout and the possibility of a relationship in the future. Soderberg brought that insurance policy to the October 17, 2016 meeting for Drake to review while simultaneously handing Drake $50 for the purchase of the firearm. Drake needed a home and Soderberg impliedly promised a home. We agree that the State proved a continuing course of conduct, during which the promises of money, companionship, and a home intertwined.

Legal Financial Obligations

The sentencing court imposed a $500 crime victim assessment, a $200 criminal filing fee, and a $100 DNA collection fee. Martie Soderberg contends that this court should order the trial court to strike the imposition of the $200 filing fee and the $100 DNA fee because the court made no inquiry into her financial resources or present or future ability to pay. The State concedes error with regard to the criminal filing fee.

Based on *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), we accept the concession.

Martie Soderberg did not have earlier felony convictions. Therefore, the State has likely not collected her DNA. We thus do not vacate the DNA fee.

Statement of Additional Grounds

Pursuant to RAP 10.10, Martie Soderberg raises a number of issues in a statement of additional grounds. She argues that she took no substantial step toward murdering her husband. Nevertheless, her counsel already forwarded this argument in Soderberg's appeal brief. This court does not consider arguments repetitive of appellant counsel's briefing. *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

Martie Soderberg alleges that Martin Drake coaxed her into uttering all comments captured on the audiotape and that Drake lied at trial. In addition, Soderberg claims that she never gave Drake $50 to purchase the handgun. She questions why the State never tested the currency for fingerprints. She also complains that law enforcement never reviewed video camera recordings from her meeting with Drake at Shari's Restaurant. She does not, however, supply any argument as to why these alleged anomalies violated the law.

CONCLUSION

We affirm Martie Soderberg's convictions for attempted first degree murder and solicitation for murder. We remand to the sentencing court to vacate the imposition of $200 for the criminal filing fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Siddoway, J.